Filed 6/1/22  P. v. Gray CA2/8
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B282321 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA106735) |
| v. | |
| TREVAIL GRAY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Bruce F. Marrs, Judge.  Affirmed in part; reversed in part and remanded with directions.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald Engler and Lance E. Winters, Chief Assistant Attorneys General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle, Michael Katz, Amanda V. Lopez and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

In 2017, a jury convicted defendant and appellant Trevail Gray of multiple felonies, including three counts of attempted murder. The jury found true the allegations the attempted murders were willful, deliberate and premeditated and that they were committed for the benefit of a criminal street gang. It also found true that a principal discharged a firearm in the commission of the offenses. Defendant, who admitted a prior qualifying strike, was sentenced to 147 years to life in prison.

Defendant appealed. In an opinion filed October 1, 2018, we struck the gang enhancements and, in light of legislation passed while the appeal was pending (Senate Bill 620 (2017–2018 Reg. Sess.)), we remanded to permit the trial court to consider whether to exercise its newly acquired discretion to strike the Penal Code section 12022.53 firearm enhancements. We otherwise affirmed the judgment.

Defendant petitioned the Supreme Court for review. On September 11, 2019, the Supreme Court transferred the matter back to our court with directions to vacate our decision and reconsider the cause in light of Senate Bill 1437 (2017–2018 Reg. Sess.) which became effective January 1, 2019. As originally enacted, Senate Bill 1437 amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).) Senate Bill 1437 also added Penal Code section 1170.95 which set forth a procedure whereby a "person convicted of felony murder or murder under a natural and

probable consequences theory" could petition for resentencing relief.  (Former § 1170.95, subd. (a).)

After receiving supplemental briefing from the parties, we issued our decision on November 21, 2019.  (*People v. Gray* (Nov. 21, 2019, B282321) [nonpub. opn.].)  We concluded, given the plain meaning of the statutory language at that time, that Penal Code section 1170.95 did not apply to attempted murder nor could defendant raise a Senate Bill 1437 challenge on direct appeal.  (*People v. Gray, supra,* B282321.)  We once again affirmed defendant's conviction after striking the gang enhancements and remanding for the court to reconsider the firearm enhancements.  (*Ibid*.)

Defendant again petitioned the Supreme Court for review.  In October 2021, while this case was pending in the Supreme Court, the Legislature passed Senate Bill 775 (2021–2022 Reg. Sess.) which, among other things, amended the language of Penal Code section 1170.95 by expanding the scope of the resentencing provision to include individuals who had been convicted of attempted murder under a natural and probable consequences theory.  (Stats. 2021, ch. 551, § 2.)  Senate Bill 775 also amended the statute to expressly provide that relief may be sought on direct appeal.  Section 1170. 95, subdivision (g) now provides that "[a] person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437."

On December 29, 2021, the Supreme Court transferred the matter back to this court with directions to vacate our opinion and reconsider the cause in light of Senate Bill 775.  The parties filed supplemental briefs.

3

We asked the parties to submit further supplemental briefs concerning the impact, if any, on the passage of Assembly Bill 333 (2021–2022 Reg. Sess.), amending Penal Code section 186.22 and adding new section 1109 regarding criminal street gangs, which became effective January 1, 2022. (Stats. 2021, ch. 699, §§ 3, 4, 5.) The parties submitted supplemental briefs.

Having vacated our prior decision and reconsidered the matter in light of the new legislation, we now reverse the attempted murder convictions (counts 1, 2 & 3) and all enhancements associated with those three counts. We also reverse the gang enhancements imposed on all counts. We otherwise affirm the judgment of conviction and remand to the trial court for further proceedings consistent with this opinion.

## BACKGROUND

Defendant was charged with three counts of attempted murder (Pen. Code, §§ 187, 664; counts 1–3), three counts of assault with a firearm (§ 245, subd. (a)(2); counts 4–6), two counts of being a felon in possession of a firearm (§ 29800, subd. (a)(1); counts 7–8), one count of being a felon in possession of ammunition (§ 30305, subd. (a)(1); count 9), and one count of resisting an executive officer (§ 69; count 12). It was alleged the attempted murders were willful, deliberate and premeditated and that they were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Various firearm allegations were also alleged (§§ 12022.5, subd. (a), 12022.53, subds. (b)–(e)(1)). It was further alleged defendant had suffered a prior serious felony conviction and a prior prison term (§§ 667, subds. (a), (b)–(i), 667.5, subd. (b), 1170.12, subds. (a)–(d)). (Counts 10 and 11 were dismissed at the preliminary hearing.)

4

The charges arose from an October 25, 2013 shooting at a liquor store in Pomona. The material facts are summarized from our 2019 opinion. (*People v. Gray*, *supra*, B282321.)

The shooting was captured from various angles by a number of surveillance cameras around the liquor store. Videotape of the incident was shown to the jury at trial. We reviewed key portions of the videos.

The videotape shows a man, later identified as defendant's uncle, James Gray (Blue), at the liquor store at about 10:30 p.m. In the store's parking lot, Blue interacted with a man later identified as Raymond Sears, including hugging him. Blue then went inside the liquor store, came back out and left. Blue returned to the store about seven to eight minutes later driving a pickup truck. A man wearing a blue plaid shirt, later identified as defendant, got out of the truck, followed by a man in a white shirt.

Defendant and his companion walked along the front of the liquor store toward the entrance. As they passed by the entrance, the man in the white shirt fired a number of bullets at Sears's truck. The gun was very close to defendant's head when the man in the white shirt fired it, and defendant ducked away from the gun and went into the liquor store. Defendant reappeared briefly at the store's door, pointed a gun out the store door and then retreated inside the store.

Sears and two companions were in the front seat of his truck when the man in the white shirt opened fire. Although injured, Sears was able to flee on foot with his two companions, later identified as Ronald Bailey and Steven Goines.

Pomona Police Department officers came to the scene. Sergeant Scott Hess spoke with the liquor store's owner, Saung Lee. The sergeant watched several surveillance videos with

5

Mr. Lee in the manager's office. The man in the blue plaid shirt looked familiar to Sergeant Hess, and he later realized he had participated in a traffic stop of the man. Sergeant Hess identified the man in the blue plaid shirt as defendant.

Mr. Lee told Sergeant Hess the man in the blue plaid shirt (defendant), was a frequent customer. Lee said defendant was standing next to the man in the white shirt when the man in the white shirt began firing a gun. Lee later found defendant "wandering around" inside the liquor store, holding a handgun. Lee directed him out the back door of the store to avoid further trouble.

Other officers went to a 7–Eleven convenience store nearby. Officer Robert Scheppmann found Sears there with head and hand wounds. There was a blood trail at the entrance to the convenience store and Officer Scheppmann eventually followed the trail to the parking lot of the liquor store. Detective Andrew Bebon also went to the 7–Eleven where he saw the injured Sears. Sears was unable to speak. Sears was transported via helicopter to Los Angeles County+USC Medical Center. There is no evidence the police were able to speak with Sears at the hospital. Sears survived and was able to leave the hospital. Detective Bebon spoke to Sears once or twice on the phone about victim's services but was unable to locate him thereafter.

Officer Richard Aguiar showed photos taken from the surveillance videos to people who lived in the area. Jerry Orsborn and Linda Nelson identified defendant in the photos, although they recanted their identification at trial. Officer Aguiar had seen defendant before and recognized him in the photo.

Detective Bebon attempted to locate defendant after the shooting but could not. In July 2014, he obtained an arrest warrant for defendant which ultimately led to his arrest.

After further investigation, Detective Bebon learned the identity of the two other men with Sears during the shooting. He did not locate the men until two years later, when he learned both were in prison in Nevada. Detective Bebon and his partner, Detective Catanese, travelled to Nevada and interviewed Bailey and Goines in their separate prisons. The interviews were recorded.

At trial, Goines and Bailey were uncooperative witnesses. Bailey did admit he was a member of the 456 Island Piru Bloods, a Pomona gang, and that Goines was an associate of the gang. Bailey also testified the liquor store where the shooting occurred was in a Blood neighborhood. Bailey acknowledged he had identified defendant from a group of photos and in a video of the liquor store shooting, both of which Detective Bebon showed him in prison. Bailey testified that someone said "cuz" before or during the shooting but not "Budlong." Generally, Bailey and Goines equivocated and claimed not to remember details of the shooting incident or their discussions of the incident with Detective Bebon.

Detective Bebon then testified about portions of the interviews, accompanied at times by the playing of the recordings of the interviews. Detective Bebon testified he showed a photograph to Goines, and Goines pointed to a person in the photo, elsewhere identified as defendant, and said the person was the one saying "cuz." Goines also stated he saw the person with a gun. Detective Bebon testified he showed the same photo to Bailey, who identified the man in the blue plaid shirt as "Sticks." Defendant was known by that moniker. Detective Bebon also

7

testified that Bailey stated he heard either Sticks or the man in the white shirt say "Budlong."

Detective Bebon additionally testified about a December interview he had with Bailey in Pomona. Bailey told him that before the shooting, Bailey was "Blooding," that is, speaking to Goines in the parking lot using Blood gang slang. The detective confirmed that Bailey admitted his membership in the 456 Island Piru Bloods and that Goines was an associate of the gang.

A redacted version of the recordings of each of the three interviews was admitted into evidence, along with the redacted transcripts. A more detailed summary of the men's Nevada interview statements is provided in part 4, below, discussing defendant's new trial motion.

Los Angeles County Sheriff's Deputy Joshua Whiting testified for the prosecution as a gang expert on the 10 Deuce Budlong Gangster Crips. He opined that defendant was a member of that gang. Deputy Whiting also testified that Crips and Bloods are generally enemies. In response to a hypothetical based on the facts of this case, Deputy Whiting opined the crimes were committed for the benefit of the Budlong Gangster Crips.

In his trial testimony, Detective Bebon provided more evidence on the background of the 456 Island Piru Bloods gang. He testified the liquor store where the shooting took place was located at the edge of that gang's territory. The detective testified the 456 Island Piru Bloods gang had been in a rivalry with several Crips gangs for a long time. Detective Bebon also opined the shootings were committed for the benefit of the Budlong Gangster Crips.

Defendant testified in his own defense at trial. He stated he did not know the man in the white shirt who rode with him to the liquor store in Blue's truck. At the liquor store, defendant got

out of the truck and started walking toward Sears to say hello. The unknown man walked with him. Defendant did not know the man had a gun. When defendant heard shots, he was scared, thought the shooter was firing at him and tried to escape.

Inside the liquor store, defendant took out a gun which he carried for self-protection. He pointed the gun out the store's door but did not shoot. Defendant went back inside the store and eventually left through a back entrance with two women. He did not know Bailey or Goines and did not shoot at anybody.

The jury found defendant guilty as charged. As to the attempted murder counts, the jury found true the allegations that a principal personally used and discharged a firearm in the commission of the offenses. (Pen. Code, § 12022.53, subds. (b) & (e)(1).) As to the assault counts, the jury found true the allegation defendant personally used a firearm in the commission of the offenses. (§ 12022.5, subd. (a).) As to counts 1 through 6, the jury found true the gang allegation. (§ 186.22, subd. (b).) Defendant admitted the strike and prison prior allegations.

The court sentenced defendant to an aggregate state prison sentence of 147 years to life, calculated as follows: seven years to life on count 1 (the base term), doubled due to the strike, plus a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)) and a consecutive 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)(C)). The court imposed consecutive 49–year terms on counts 2 and 3, calculated in the same manner as count 1. The court exercised its discretion to strike the five–year felony enhancements and the prison priors.

The court imposed and stayed sentence on the remaining counts: On each of counts 4, 5 and 6, a midterm of three years, plus four years for the firearm enhancement (§ 12022.5, subd. (a)), plus five years for the gang enhancement; the court

9

struck the five–year priors and prison priors; on count 7, a midterm of two years plus one year for the prison prior; on count 8, a midterm of two years doubled due to the strike, plus a three–year gang enhancement; on count 9, a midterm of two years, plus a three–year gang enhancement; and on count 12, a two–year midterm. The court awarded defendant 477 days of presentence custody credits.

## DISCUSSION

We begin with a discussion of the issues raised by the passage of new legislation while defendant's appeal has been pending as our determination of those issues moots some of the original contentions raised by defendant.

### 1. Attempted Murder (Counts 1, 2 & 3)

Because of the postconviction change in the law regarding liability for attempted murder, defendant's convictions on counts 1, 2 and 3 must be reversed.

It is undisputed the jury was instructed that defendant could be found guilty of attempted murder based on the natural and probable consequences doctrine, a theory that is no longer valid in light of the passage of Senate Bills 1437 and 775. (Pen. Code, § 188, subd. (a)(3); see also *People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.) The People do not dispute the change in law but argue that because the jury was also instructed with direct aiding and abetting principles, the instructional error may be found harmless. We are not persuaded.

Instructional error based on a misdescription or omission of an element of an offense is subject to harmless error analysis under the test set forth in *Chapman v. California* (1967) 386 U.S. 18. (*People v. Mil* (2012) 53 Cal.4th 400, 409, 415–417 [reviewing court must reverse unless, after examining the entire record, it can conclude beyond a reasonable doubt the jury verdict would

10

have been the same absent the instructional error]; accord, *Neder v. United States* (1999) 527 U.S. 1, 4; see also *People v. Aledamat* (2019) 8 Cal.5th 1, 9, 13 [reviewing court must reverse for alternate theory error "after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt"].)

The evidence summarized above does not convince us beyond a reasonable doubt that defendant acted with the requisite intent now required to be found guilty of attempted murder. Further, the record does not show beyond a reasonable doubt that the jury did not rely on the invalid natural and probable consequences theory in finding defendant guilty of the attempted murders. The prosecutor argued both theories and even emphasized the natural and probable consequences theory in his closing argument.

While the jury found true the allegation the attempted murders were willful, deliberate and premeditated, the jury was instructed with CALJIC No. 8.67 which allowed the jury to find the attempted murders were premeditated if the jury found "the would-be slayer" weighed and considered the question of killing before making a direct but ineffectual act to kill another human being. There was no evidence or argument that defendant was the "would-be slayer." Rather, the evidence showed the man in the white shirt who actually fired his weapon was the would-be slayer. The jury was *not* instructed it had to specifically find defendant, as the accomplice, acted with premeditation. And, in closing argument, the prosecutor underscored this point, saying "[w]ith attempted murder, all that's required for the willful, deliberate, and premeditation is that any principal have that state of mind. So a finding that the guy in the white shirt fired

11

that weapon with the intent to kill and did it willfully and with deliberation and premeditation is sufficient in this case where we have two defendants participating in the crime." Thus, the jury's premeditation findings are insufficient to conclude the instructional error was harmless beyond a reasonable doubt.

All three convictions for attempted murder (counts 1, 2 & 3) must be reversed, and all findings and enhancements associated with those counts reversed as well. On remand, the prosecution may retry defendant for attempted murder on a legally valid theory. Where, as here, a postconviction change in the statutory or decisional law invalidates the theory upon which a conviction is based, the prosecution may retry the defendant on a legally valid theory. (See, e.g., *People v. Chiu* (2014) 59 Cal.4th 155, 168 (*Chiu*).)

**2.    The Gang Findings and Enhancements**

Because of the postconviction change in the law, all of the gang findings and enhancements on all counts must be reversed.

Assembly Bill 333 amended Penal Code section 186.22 by, among other things, changing the definition of "pattern of criminal gang activity," specifying the benefit to the gang must be more than reputational, and eliminating certain crimes like looting and felony vandalism as qualifying predicate offenses. (Stats. 2021, ch. 699, §§ 3, 4.) Assembly Bill 333 also addedPenal Code section 1109 which requires that a gang allegation shall be tried separately at the request of a defendant and only after the defendant is found guilty of the substantive offense. (Stats. 2021, ch. 699, § 5.)

With respect to the amendments to Penal Code section 186.22, the parties agree the changes apply retroactively to defendant whose conviction is not yet final and that a reversal of the gang findings is warranted. We agree. (See, e.g., *In re*

12

*Estrada* (1965) 63 Cal.2d 740, 742–748 (*Estrada*); *People v. Vieira* (2005) 35 Cal.4th 264, 305–306 ["a defendant generally is entitled to benefit from amendments that become effective while his case is on appeal"].)

All gang findings and enhancements must be reversed. On remand, the prosecution shall have the opportunity to retry the gang allegations under the amended requirements of Penal Code section 186.22. (*Chiu*, *supra*, 59 Cal.4th at p. 168.)

As for Penal Code section 1109, defendant contends the new statute must also be applied retroactively. He contends the inherently prejudicial nature of the gang evidence introduced during his trial resulted in a miscarriage of justice amounting to structural error such that a reversal is warranted on all counts. Alternatively, he contends that reversal is warranted even if harmless error analysis applies, because the prejudicial evidence necessarily contributed to the verdicts.

We disagree. The rules concerning whether a new law applies prospectively or retroactively are well established. (*People v. Buycks* (2018) 5 Cal.5th 857, 880 (*Buycks*).) Penal Code section 3 plainly states that no part of the Penal Code is retroactive "unless expressly so declared." *Buycks* instructs that " '[t]he language of section 3 erects a strong presumption of prospective operation, codifying the principle that, "in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the [lawmakers] . . . must have intended a retroactive application." [Citations.] Accordingly, " 'a statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective.' " ' " (*Buycks,* at p. 880.)

Under *Estrada*, *supra*, retroactivity will be applied in those circumstances where a newly enacted statute is "intended to

ameliorate criminal punishment." (*People v. Cervantes* (2020) 55 Cal.App.5th 927, 938, citing *Buycks*, *supra*, 5 Cal.5th at p. 881.)

Penal Code section 1109 creates a new *procedural* rule, allowing for bifurcation of gang allegations upon the request of the defendant. "[I]t does not reduce the punishment or narrow the scope of the application of the gang statute." (*People v. Perez* (2022) 78 Cal.App.5th 192, 207 [concluding § 1109 does not apply retroactively]; but see *People v. Burgos* (2022) 77 Cal.App.5th 550, 568 [concluding the opposite].) We therefore conclude that newly enacted section 1109 does not apply retroactively and does not require reversal of the entire judgment.

### 3. The Firearm Enhancements

Senate Bill 620 amended the firearm enhancements codified at Penal Code section 12022.5 and section 12022.53, removing the prohibition on the sentencing court's discretion to strike firearm use enhancements. (Stats. 2017, ch. 682, §§ 1 & 2.) The parties agree the new legislation was ameliorative in nature and that defendant is entitled to its benefit. (*Estrada*, *supra*, 63 Cal.2d at pp. 742–748; *People v. Vieira*, *supra*, 35 Cal.4th at pp. 305–306.) We agree.

The firearm use enhancements pursuant to Penal Code section 12022.53 imposed on counts 1, 2 and 3 are reversed as discussed in part 1, above.

On remand, the court shall have the opportunity to exercise its discretion under Penal Code section 12022.5 to strike or impose the firearm use enhancements as to counts 4, 5 and 6.

### 4. The Motion for New Trial

In his original briefs, defendant moved for a new trial. As we have previously concluded, defendant has not demonstrated error in the court's denial of that motion.

Defendant moved for a new trial on (1) the statutory ground of newly discovered evidence, (2) the denial of a fair trial due to the presentation of perjured testimony, and (3) a violation of the duty to disclose exculpatory evidence pursuant to *Brady v. Maryland* (1963) 373 U.S. 83. All three claims were based on declarations submitted by Bailey and Goines after trial, in which the men asserted Detective Bebon had pressured them into providing false statements during a recorded interview. The declarations implied the pressure occurred prior to the recording beginning. The detective submitted a declaration denying any unrecorded discussions with the men. The trial court denied the new trial motion.

Defendant contends the trial court's "erroneous legal conclusions" that Bailey and Goines were " 'bit players' " in the trial contravened the record and United States Supreme Court precedent. Defendant claims the men were "crucial" to the prosecution's case and their testimony supported the motive and intent for the offenses and for the gang enhancement. Defendant asserts the "[e]xculpatory and impeaching evidence" in the men's posttrial declarations put the case in a different light, undermined confidence in the outcome and requires reversal. In his reply brief, defendant claims the trial court's explanation of its ruling constituted an "express and/or implied factual finding that the posttrial declarations were credible" and that this finding binds this court.

### a. Background

On February 25, 2017, about a month after the jury reached its verdicts in this matter, Bailey and Goines executed declarations recanting portions of their recorded pretrial prison interview statements to Detective Bebon. These pretrial

statements had been used at trial to impeach Bailey and Goines, who were reluctant witnesses.

Goines's posttrial declaration states that at the beginning of his pretrial prison interview with Detective Bebon, the detective said the interview was not being recorded. Detective Bebon then showed Goines a photographic lineup, pointed to one of the photos and said it was "Sticks," and Sticks was the person who shot at Goines. Goines did not know who Sticks was. Detective Bebon then asked "questions, such as, 'He said the word cuz, didn't he?' " Goines replied that he did not. Detective Bebon asked Goines "to agree with what he (Bebon) was saying. Det[ective] Bebon said, 'Sticks said, "yeah, cuz." ' [¶] Det[ective] Bebon told [Goines], 'I will put you in [a] gang file if you don't corroborate what I was saying.' " The interview was in fact recorded. The statements attributed to Detective Bebon do not appear anywhere in the recording of the detective's interview with Goines, and Goines does not offer a theory to explain their absence from the recorded interview.

Bailey's posttrial declaration states that at the beginning of his pretrial prison interview, Detective Bebon asked him if he " 'remember[ed] something that happened at a liquor store in Pomona when [Bailey] got shot at?' " Bailey "indicated yes." Detective Bebon asked Bailey if he would be willing to testify about it and Bailey "told him no because I don't really remember any of it." Detective Bebon then showed Bailey a photo and told him it was "Sticks." Before seeing the photo, Bailey "did not know what Sticks looked like." According to Bailey, "Det[ective] Bebon then began to use leading questions to give facts about what occurred. He showed another picture and said, 'Didn't [S]ticks get out of the car first and said "Budlong Cuz?" ' I told him (Bebon) that I thought I heard the word 'cuz' but not

16

'Budlong,' and I don't know who said it. I didn't see who got out first because I was ducking." Bailey stated that "[a]bout halfway through the interview, Det[ective] Bebon reintroduced himself again. He re-showed the photographs again [*sic*], and re-asked most of the questions he already asked." The statements attributed to Detective Bebon do not appear anywhere in the recording of the detective's pretrial prison interview with Bailey. Bailey's reference in his posttrial declaration to the detective "re-asking" questions during the pretrial prison interview implies that either the first part of his pretrial prison interview with Detective Bebon was not recorded, or that the recording produced by the detective was not complete.

In opposition to defendant's motion, the prosecution submitted a posttrial declaration from Detective Bebon that states: "The entire conversation that I had with both Steven Goines and Ronald Bailey was audio taped. Those recordings were provided as part of the discovery process." The detective also stated: "I did not talk to either Goines or Bailey on July 19, 2016 off-tape. The recording is the entirety of my interaction with both witnesses on that date. The recordings were started prior to each separate inmate being brought into each individual interview room."

The trial court denied the new trial motion without expressly ruling on the credibility of Bailey's and Goines's posttrial declarations. The court explained that "the primary witness in this particular case was the cameras and the video system. Everybody else was basically a supporting character." The court pointed out that Bailey's trial testimony was in fact consistent with his posttrial declaration: Bailey testified at trial that he only heard the word "cuz" and not the word "Budlong."

17

The court also pointed out that defendant was identified from the video stills by other witnesses in addition to Bailey and Goines. The court concluded: "Taking all of this material, as well as the balance of the information, I don't find that we have anything material to add to the information that was presented to the jury. Cross examination for all the witnesses was extensive. I think it's all cumulative, to be honest with you. As to the statements from the two folks from Nevada, they were at best bit players. The case could have been proved beyond a reasonable doubt . . . without them even appearing. They appear on the disks that were presented from the video in the store."

### b. Standard of review

Defendant's motion for new trial included two claims which, if true, would show violations of his federal constitutional rights: (1) the presentation of perjured testimony, and (2) a *Brady* violation.

A trial court's ruling on a motion for a new trial is reviewed under a deferential abuse of discretion standard. (*People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27 (*Hoyos*), overruled in part on other grounds as stated in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) Thus, we will not disturb the trial court's ruling unless defendant establishes " 'a manifest and unmistakable abuse of discretion.' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) This standard of review applies even when, as here, the defendant asserts violations of federal constitutional rights. (*Hoyos*, at p. 917, fn. 27.) In such circumstances, the defendant's abuse of discretion claim is best understood as the asserted failure of the trial court to recognize violations of defendant's constitutional rights. (*Ibid*.) Our abuse of discretion analysis must therefore also address the constitutional aspects of

18

the motion under the appropriate standard for those claims. (*Id*. at pp. 917–922 [performing a traditional *Brady* analysis].)

### c. *Brady* claim

Defendant describes the evidence he claims to have been suppressed as undisclosed (and apparently unrecorded) discussions between Detective Bebon and Bailey and Goines which immediately preceded the recorded pretrial prison interviews with Bailey and Goines (which had been disclosed to the defense). The motion states that during those earlier unrecorded discussions, Detective Bebon provided the men with "information and direction which resulted in their testimony at trial."

The elements of a *Brady* claim involve "[c]onclusions of law or of mixed questions of law and fact, . . . [citation] [and] are subject to independent review." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042 (*Salazar*).) Findings of fact by the trial court "though not binding, are entitled to great weight when supported by substantial evidence." (*Ibid*.)

" 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' (*Strickler v. Greene* (1999) 527 U.S. 263, 281–282, fn. omitted.) Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' (*United States v. Agurs* [(1976)] 427 U.S. [97,] 112, fn. 20.) Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible (cf. *Wood v. Bartholomew* (1995) 516 U.S. 1, 2), that the absence of the suppressed evidence made conviction 'more likely' (*Strickler*, *supra*, . . . at p. 289), or that using the

19

suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' (*ibid.*). A defendant instead 'must show a "reasonable probability of a different result." ' (*Banks v. Dretke* (2004) 540 U.S. 668, 699.)" (*Salazar*, *supra*, 35 Cal.4th at p. 1043.)

" 'In general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citation]. In contrast, a new trial is generally not required when the testimony of the witness is "corroborated by other testimony" [citations].' " (*Salazar*, *supra*, 35 Cal.4th at p. 1050.)

### i.    Suppressed evidence

Although the defense motion characterized the allegedly suppressed unrecorded pretrial discussions as influencing the men's trial testimony, the posttrial declarations themselves, as set forth in detail above, refer to Detective Bebon's influence on the men's pretrial prison interview statements. The men specifically identified two areas where they lied in their pretrial prison statements: (1) their identification of defendant as one of the men who got out of the pickup truck at the liquor store; and (2) their statements that defendant and/or the shooter said "cuz" and/or "Budlong" prior to or during the shooting. At trial, the men claimed not to remember some of their pretrial prison statements and denied others were true. Thus, the allegedly suppressed evidence would have been relevant to impeach some of the men's trial testimony and some of their pretrial prison interview statements, which were introduced at trial through the testimony of Detective Bebon.

### ii.    Identification statements and testimony

20

Very early in his trial testimony, when questioned directly about events leading up to the shooting, Bailey stated all he saw on the night of the shooting was the pickup truck pull up in the liquor store parking lot. The prosecutor then shifted to asking Bailey about his pretrial statements to Detective Bebon. Bailey acknowledged he had identified Sticks from a group of photos which the detective showed him. Bailey also agreed he pointed out a person who appeared to be Sticks in a video from the liquor store shooting. Bailey claimed, however, not to recall telling the detectives he saw Sticks get out of the pickup truck driven by Blue. Bailey claimed he ducked when the car pulled up and did not see who got out of the pickup truck.

Bailey was ultimately impeached during trial with his recorded statements to Detective Bebon. In that interview, Bailey said Sticks got out of the pickup truck at the liquor store with another man. Bailey also said the man in the white shirt raised a gun as he and Sticks were walking around the pickup truck.

In his posttrial declaration, Bailey recanted his identification of the person in the photos/video as "Sticks." He stated he did not know what "Sticks" looked like before Detective Bebon showed him a photo during the prison interview.

Goines, too, indicated early in his testimony that he did not remember the events that led up to the shooting. The prosecutor asked Goines about his statements to Detective Bebon. Goines testified he did not remember telling Detective Bebon he had seen two men get out of the pickup truck. He testified he had his head down and did not see anything. Goines also denied Bailey told him the shooter was Sticks. Goines testified he could not remember if he told Detective Bebon that Bailey said Sticks was the shooter.

21

Goines was ultimately impeached during trial with his recorded pretrial interview statements to Detective Bebon. In that interview, Goines had told the detective that one of the men who got out of the pickup truck went by the name of Sticks. However, when shown a group of photos, Goines said, "I don't know which one Sticks is." Detective Bebon asked Goines how he heard that the man might be called Sticks. Goines responded that Bailey told him after the shooting that Sticks was the person who shot at them.

In his posttrial declaration, Goines recanted his pretrial prison statements indicating that Sticks was involved in the shooting. Goines now declared he did not know who Sticks was before Detective Bebon showed him a photo lineup during the prison interview.

The trial court found that defendant had been identified by other witnesses, as well as being seen in the video of the shooting. Our independent review of the record confirms these findings are supported by substantial evidence: Defendant's identity and presence were corroborated by videos of the shooting and the testimony of Orsborn, Nelson, Officer Aguiar and Sergeant Hess. A new trial is generally not required where the allegedly suppressed evidence related to witness testimony that was otherwise corroborated. (*Salazar*, *supra*, 35 Cal.4th at p. 1050.)

### iii. Statements and testimony about "cuz" and/or "Budlong"

Goines testified at trial that he only heard gunshots, and he did not remember telling Detective Bebon in the pretrial prison interview that he had heard someone say "cuz." Goines was ultimately impeached at trial with his recorded pretrial prison interview statements to Detective Bebon. In that

interview, Goines told the detective that one of the men who got out of the pickup truck said "Yeah, cuz" repeatedly.

In his posttrial declaration, Goines stated that Sticks did not say "cuz" and he told Detective Bebon this in the pretrial prison interview. Goines stated in his declaration that the detective pressured him to agree that Sticks did say "cuz," and Goines bowed to that pressure.

Bailey testified at trial that all he heard was the word "cuz." He did not tell Detective Bebon during the pretrial prison interview that he heard "Budlong." When informed that Detective Bebon had recorded the pretrial prison interview, Bailey stood by his claim that he heard the word "cuz" but not the word "Budlong." Bailey was ultimately impeached at trial with his recorded pretrial prison interview statements to Detective Bebon. In that interview, Bailey told the detective that one of the men said, "Budlong," but Bailey was not sure which one.

In his posttrial declaration, Bailey stated that during the pretrial prison interview, Detective Bebon asked Bailey if Sticks said "Budlong Cuz" but Bailey replied that he only heard "cuz," and he did not know which of the men said it.

The use of the words "cuz" and "Budlong" were relevant primarily to the gang enhancement allegation. Significantly, Deputy Whiting, the prosecution's primary gang expert, was asked about the importance of these words to his opinion that the crimes were committed for the benefit of the Budlong Crips. On cross-examination, defense counsel asked Deputy Whiting if it would change his opinion if "no one heard anything being yelled? For example, the factor would be removed of yelling of 'cuz' or 'Budlong.' Would that change your [opinion]?" Deputy Whiting replied, "No."

23

Thus, even if the likely impact of the suppressed evidence would have been to undermine Goines's and Bailey's statements and testimony about "cuz" and "Budlong," those statements and testimony were not needed to support a critical element of the prosecution's case. Thus, the "cuz/Budlong" impeachment evidence does not meet the Brady standard of materiality. (See *Salazar*, *supra*, 35 Cal.4th at p. 1050 [impeachment evidence is material if " 'the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case' "].)

### iv. Overall credibility

Considering the impact of Bailey's and Goines's posttrial declarations on the men's overall credibility, we find that impact would have been little to none. Both men had otherwise shown themselves to be less than honest and forthcoming. Goines, for example, stated in his prison interview that he "grew up in Perris and Moreno Valley" and "had barely started coming to Pomona only, like, two or three months" before the shooting. These statements were made to support his claim he was not a 456 Island Piru Bloods gang member and was only loosely connected to that gang as an associate. At trial, however, Goines testified he grew up in Pomona and had lived in Perris "at some point." While the trial was ongoing, Bailey was revealed to have lied in his trial testimony when he denied making his pretrial "Budlong" statement to Detective Bebon; further, Bailey effectively claimed in his trial testimony that his recorded pretrial statement to Detective Bebon on this topic was a lie. Both Bailey and Goines had convictions for crimes of moral turpitude, affecting their credibility. Both men were very evasive in answering even minor unimportant questions at trial, responding with equivocal answers, claims of lack of recollection, or both.

24

### v. Prejudice

Prejudice is, in effect, assessed through the materiality prong of a *Brady* claim.  Suppressed "evidence is material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'  'A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' "  (*Hoyos*, *supra*, 41 Cal.4th at pp. 917–918.)  The defendant has the burden of showing materiality.  (*Id*. at p. 918.)

For the reasons set forth above, we see no reasonable probability of a different outcome at trial if the contents of the posttrial declarations had been disclosed to the defense before trial.  The evidence was not material, and so there was no *Brady* violation.  The trial court did not abuse its discretion in disagreeing with the defense that a Brady violation had occurred.

### d.  Newly discovered evidence

In ruling on a motion for new trial based on the ground of newly discovered evidence, the trial court similarly considers whether the evidence is " ' " 'such as to render a different result probable on a retrial of the cause.' " ' " (*People v. Howard* (2010) 51 Cal.4th 15, 43.)  The court also considers whether the new evidence is material and not cumulative.  (*Ibid*.)  Here, the trial court ruled that the declarations did not add anything "material" to the information that was presented to the jury, and the evidence offered in support of the motion for new trial was "cumulative."  This is an implied finding that it was not reasonably probable the new evidence would result in a different outcome.  As our discussion above shows, there is substantial evidence to support the trial court's findings on the nature of the newly proffered evidence.  Further, we have concluded in our *Brady* analysis that the new evidence did not render a different

result reasonably probable.  Thus, the trial court did not abuse its discretion in denying the new trial motion made on statutory grounds.

### e.  False testimony

"When the prosecution fails to correct testimony of a prosecution witness which it knows or should know is false and misleading, reversal is required if there is any reasonable likelihood the false testimony could have affected the judgment of the jury.  This standard is functionally equivalent to the ' "harmless beyond a reasonable doubt" ' standard of *Chapman v. California*[, *supra*,] 386 U.S. 18."  (*People v. Dickey* (2005) 35 Cal.4th 884, 909 (*Dickey*).)

Defendant contends the court's statement "it's all cumulative, to be honest with you" is an implied finding that Bailey's and Goines's declarations were credible.  Defendant further contends this court is bound by those findings.  While we do not agree, we will assume for the purpose of considering defendant's argument that Bailey's and Goines's claims in their declarations that they did not know and/or recognize defendant were true, and Bailey's testimony to the contrary at trial was false.  We will also assume for this purpose that the introduction into evidence at the trial of the men's statements to Detective Bebon asserting that defendant or his companion used the words "cuz" and/or "Budlong" constituted the presentation of false testimony.

We independently review the record (see *Napue v. Illnois* (1959) 360 U.S. 264, 272) and see no "reasonable likelihood [that] the false testimony could have affected the judgment of the jury" (*Dickey*, *supra*, 35 Cal.4th at p. 909, italics omitted).  As we explained in our discussion of defendant's *Brady* claim, other witnesses identified defendant as the man in the blue plaid shirt

26

in the video. Deputy Whiting's opinion was not dependent on whether defendant or the shooter said either "cuz" or "Budlong." There was ample evidence from other witnesses to support the true finding on the gang enhancement. Overall, the credibility of Bailey and Goines was significantly impeached during trial. Thus, any admission of false testimony was harmless beyond a reasonable doubt. (See *Dickey*, at p. 909.)

5.     **The Jury Instructions**

In his original briefing, defendant raised several claims of instructional error. Most have been mooted by our reversals on counts 1, 2 and 3. However, to the extent defendant's argument regarding the aiding and abetting instruction is relevant to the assault counts which we affirm, we discuss, and reject, his claim of error on the merits.

Defendant contends the trial court committed two errors in instructing the jury on general principles of aiding and abetting using a modified version of CALJIC No. 3.01: (1) leaving in the phrase "by failing to act in a situation where a person has a legal duty to act" even though defendant had no duty to act and (2) omitting the word "and" between two clauses in the last paragraph. He claims these errors violated both state and federal constitutional law and were not harmless.

The People contend the "instruction [was] correct in law and responsive to the evidence" and so defendant has forfeited his claim that the instruction was "too general or incomplete" by failing to request clarifying or amplifying instructions during trial proceedings. (*People v. Johnson* (2016) 62 Cal.4th 600, 638.)

Defendant's first claim is that the reference to a legal duty to act was not responsive to any evidence in the case; that claim is not forfeited. His second claim is that the instruction is incomplete without the use of the word "and." Although that

27

claim is otherwise forfeited, we review it pursuant to Penal Code section 1259, which permits review of an instruction given by the trial court even though it was not objected to if the substantial rights of the defendant were affected thereby. "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

The first error appears in context as follows: "A person aids and abets the commission or attempted commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice, or, *by failing to act in a situation where a person has a legal duty to act*, aids, promotes, encourages or instigates the commission of the crime." (Italics added.) Defendant contends and the People agree that defendant had no legal duty to act.

"Giving an instruction that is correct as to the law but irrelevant or inapplicable is error. [Citation.] Nonetheless, giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.) Such an error violates California law but does not implicate the United States Constitution. The error is reviewed under the reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818, 836–837. (*People v. Debose* (2014) 59 Cal.4th 177, 205–206.) In most cases, an error of this sort is harmless. (*People v. Rowland* (1992) 4 Cal.4th 238, 282.)

28

This is such a case. The language refers to "a situation where a person has a legal duty to act" but the trial court did not instruct the jury that this case presented such a situation. The prosecutor never argued or implied that defendant had a duty to act to prevent the shootings. The prosecutor's theory of the case was that defendant was either directly involved in the crimes or was liable under the natural and probable consequences doctrine. The jury was instructed pursuant to CALJIC No. 17.31 that all instructions are not necessarily applicable. The jury must be considered to have understood and dismissed the reference to a legal duty to act as mere surplusage. (See *People v. Rowland*, *supra*, 4 Cal.4th at p. 282.)

The second claimed error appears in the written version of the instruction as follows: "Mere knowledge that a crime is being committed [text redacted] the failure to prevent it does not amount to aiding and abetting." The word "and" follows "committed" in the standard version of this instruction. The trial court's reading of the instruction to the jury is transcribed as "Mere knowledge that a crime is being committed, the failure to prevent it does not amount to aiding and abetting."

Defendant contends the court's omission "mistakenly constricted and obliterated two distinct prongs excluding aiding and abetting liability." The omission of the word "and" does interject some ambiguity into this portion of the instruction. "In reviewing an ambiguous instruction, we inquire whether there is a reasonable likelihood that the jury misunderstood or misapplied the instruction in a manner that violates the Constitution." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 906 (*Covarrubias*).)

Here, it is obvious that something is missing from the sentence which comprises the last paragraph of the instruction.

29

This is particularly clear from the written instruction, reproduced above. Simply as a matter of grammar and logic, a connecting word is missing from the sentence. "We 'credit jurors with intelligence and common sense.'" (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) Rational jurors would mentally insert the words "and" or "or" into the gap. Either choice is favorable to defendant. There is no reasonable possibility that defendant was deprived of a defense to aiding and abetting liability by the manner in which this instruction was presented to them.

**6.     Prosecutorial Error**

Defendant contends the prosecutor committed prejudicial errors during opening statement and closing argument. He argues the use of the phrase "partners in crime" during opening statement was improperly argumentative and his description of Goines as a gang "member" in closing arguments misstated the evidence. Defendant further contends the prosecutor misstated the law on the mental state required for an aider and abettor of willful, deliberate and premeditated attempted murder.

Defendant did not object to these three statements or request a curative admonition. The contentions have therefore been forfeited. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328, ["making a timely and specific objection at trial, and requesting the jury be admonished . . . , is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal"].) Defendant acknowledges this rule but contends it not applicable here because either would have been futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Defendant fails to persuade us that challenging these statements would have been futile.

In any event, even if we considered defendant's claim on the merits, we would reject it.

30

Assuming, without deciding, the phrase "partners in crime" was an implicit argument about the mental states of defendant and the shooter, rather than merely a colorful description of their relationship, the court could have cured any potential prejudice by admonishing the jury the men's mental states must be determined only by them after hearing all the evidence and receiving legal instructions from the court. Moreover, any potential prejudice was slight at best. In assessing the prosecutor's argument, we must "consider the assertedly improper remarks in the context of the argument as a whole. [Citation.] 'In conducting [our] inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Covarrubias*, *supra*, 1 Cal.5th at p. 894.)

Similarly, an admonition easily could have cured any possible prejudice from the prosecutor's misstatement that Goines was a gang "member," as opposed to a gang "associate" as the evidence undisputedly showed. If defendant had objected, the trial court could have reminded the jurors of the court's opening instructions that statements made by the attorneys during trial are not evidence and that it was the jury's duty to determine what facts have been proved by the evidence. Even without an objection, the jury was re-instructed on these topics as part of the closing instructions, soon after the closing arguments. Defendant has not shown the prosecutor engaged in argument that can fairly be characterized as a " 'deceptive or reprehensible' " tactic to persuade the jury to convict. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 854.)

As for defendant's last claim, not only did he fail to preserve the contention, it is moot in light of our reversal of the three attempted murder convictions.

31

**7. Cumulative Error**

Defendant contends that even if the above-described errors were not prejudicial when considered individually, the combined effect of the errors violated his federal constitutional right to due process. We are not persuaded. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1382 [finding that to the extent any errors occurred, they were minor and "[e]ven considered collectively" they did not result in prejudice to the defendant].)

## DISPOSITION

The judgment of conviction as to defendant and appellant Trevail Gray is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion. The convictions for attempted murder (counts 1, 2 & 3) are reversed. All special findings and enhancements associated with counts 1, 2 and 3 are reversed. The gang findings and enhancements on all counts are reversed. In all other respects, the judgment of conviction is affirmed.


GRIMES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.